CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY V. STATE OF NEBRASKA ET AL.

FILED DECEMBER 31, 1923.    NO. 23693.

1. Taxation: ASSESSMENTS. While the Constitution, section 1, art. VIII, requires that "taxes shall be levied by valuation uniformly and proportionately upon all tangible property and franchises," and the statute, section 5820, Comp. St. 1922, requires that all property be assessed at its actual value, an assessment will not be set aside merely because all property has not been assessed at its actual value, provided that the assessment has been made with reasonable uniformity and proportion upon all classes of property.

2. ———: ———: DISCRIMINATION. The exclusion by the assessing authorities of "labor costs" in the valuation of improvements upon lands is not warranted by law, and the exclusion of "labor costs" from the value of such improvements when no such exclusion of "labor costs" is made in the valuation of improvements upon railroad property is erroneous, there being no authority of law for such discrimination.

Chicago, R. I. & P. R. Co. v. State.

3. ———: ———. In 1920 the valuation of lands and improvements as returned to the state board of equalization and assessment by the county boards averaged more than 68 per cent. of the actual value. The state board adopted 68 per cent. as a basis for equalization purposes and reduced the valuation accordingly. The valuation of lands and improvements for 1921 and 1922 as returned to the board was much reduced from the value fixed by the assessment of 1920, which valuation is based as stated by the board, upon investigations made in 1919 and 1920 "previous to the land boom, and does not cover the period of the highest prices." In 1923 the total reduction from the 1920 valuation was $357,196,797. *Held,* that, under the evidence, the assessment of land in 1923 still remained at about the same percentage of its actual value as in the reduced assessment of 1920.

4. ———: ———. *Held,* further, that, based upon the evidence in the record, the valuation made by the board in 1923 of the property of the complainant railroad was made "at its full actual value," or more.

5. ———: ———: DISCRIMINATION. To assess one class of property at 68 per cent. to 75 per cent. of its actual cash value, and to value the property of another taxpayer at 100 per cent. of its actual cash value, constitutes an unlawful discrimination, which is prohibited by the Constitution and statutes of the state.

6. ———: ———: REVIEW. While there may be other elements or factors upon which to determine the value of that portion of the line of an interstate railway within this state than those in evidence before the state board of equalization and produced in these proceedings, this court in reviewing the action of such board can only determine the value from the facts in evidence before the board, and those of which it is entitled to take judicial notice.

7. ———: ———: RAILROAD PROPERTY. Since there is no evidence that the portion of the line of the complainant railroad extending into other states is of more or less value than the portion of the line in this state, and there is nothing in the record to indicate that this method of allocation is unfair or unjust, the value of the portion in this state may be determined upon a mileage basis, in the proportion that the number of miles in this state bears to the mileage of the whole system.

8. ———: ———: ———. There are no settled or infallible rules for the ascertainment of the actual value of railroad property for the purpose of taxation. Approximation to actual value is all that can reasonably be expected. If the value fixed

by the state board bears a similar proportion to the actual value that the valuation of other property does, such a valuation for assessment purposes is valid.

9. ———: ———: VALIDITY: REVIEW. Where a collateral attack is made upon the validity of a tax or of an assessment, by injunction, mandamus, or like proceedings, those attacking its validity must show that the valuation was fraudulently made or that there was an intentional discrimination made between classes of property or taxpayers. But where the proceedings of such a board are reviewed in the supreme court upon error proceedings in the same case, the order of the board, like the judgment of a court in a law case, may be set aside if it is manifestly wrong, and the proceedings remanded to the assessing body for the correction of the error made.

ERROR to the State Board of Equalization and Assessment. *Reversed.*

*E. P. Holmes, Guy C. Chambers, W. F. Peter* and *W. F. Dickinson,* for plaintiff in error.

*O. S. Spillman, Attorney General, George W. Ayres* and *Hugh LaMaster, contra.*

Heard before MORRISSEY, C. J., LETTON, DEAN, DAY and GOOD, JJ., SHEPHERD, District Judge.

LETTON, J.

This is a proceeding in error under section 5901, Comp. St. 1922, to review the assessment for taxation made by the state board of equalization and assessment of that part of its property and franchises required by law to be assessed by that body. The complainant alleged in its petition for a hearing before the state board that all property in the state other than railroad property has been valued for assessment purposes by the county authorities at not to exceed 50 per cent. of its actual value; that the law provides that the property of complainant be also valued on the same basis as used for the valuation of all other classes of property; that if the tentative assessed valuation of its property be not reduced to the same percentage of actual value as other property, or unless all other property be valued and assessed

by increasing the value to the percentage at which the complainant's property has been assessed, complainant would be denied the equal protection of the law, and its property would be taken for public use without just compensation and without due process of law. It alleges that the tentative assessment of $10,694,409, made on June 15, 1923, is in excess of the actual value of the complainant's property, which does not exceed $5,186,920, and that this valuation should be further equalized with the assessment of other property in the state. The complainant requested that the board either reduce the valuation of its property to the same percentage of actual value as other property, or that it increase the valuation of all classes of property in each county to the same percentage at which the complainant's property has been assessed. Other railroad companies filed similar complaints. A hearing was had and at its conclusion the board adhered to the tentative valuation.

The testimony on behalf of the railroad companies was in substance as follows: That an investigation was made for them of the sales prices of land in 72 counties for the year ending April 1, 1923. The instructions to the examiners were to omit all transactions that appeared to be the closing up of a farm sale or transfer, and conveyances between parties who were members of the same family, or for natural love and affection, or consideration of love and one dollar. No judicial sales or sales under process were included. The investigation covered 3,227 deeds, the number of acres sold was 648,475, and the total consideration shown by the deeds was $42,411,493. The assessed valuation of the same land in 1922 was $23,730,780. The average sale price per acre was $65.40, and the average assessed valuation per acre on the same land was $36.59, being 56.9 per cent. of the sales value. It was not shown which of the sales were for cash or upon terms. There was no assessment of real estate required under the statute in 1923. The 1922 assessment remains except for improvements placed upon the land within the tax year of 1922-1923. Investigation was also made with regard to mortgaged lands. The

valuation placed upon the property by the owners, the appraisement made by the loan companies and the assessed valuation were compared. In these counties the owners' valuation was $60,854,436.; the appraisement made by the loan companies was $49,004,938, and the assessed valuation for 1922 was $24,905,799. The assessed value was 40.9 per cent. of the owners' valuation, and 50.8 per cent. of the loan companies' appraisement. There was also introduced a large number of affidavits of different landowners in the respective counties, all substantially to the effect that in each county the affiant had personally investigated the lands transferred in said county from April 1, 1922, to March 31, 1923, so as to acquaint himself with the actual sale price, location and market value of the land. A list of transfers is attached, and the affiants swear that, in their opinions arrived at from actual observation and from information obtained from grantees of some of these transfers the market value on March 31, 1923, was on the average 100 per cent. of that shown by the deeds.

Exhibit 11 was received in evidence. This exhibit contains the evidence and proceedings had before the state board in 1922, the year in which the present assessment of real estate was made. By this it is shown that, as the result of its own investigation in 1919 and 1920, the board of equalization and assessment found and determined, as to real property, for the year 1920, that "the valuations as returned by the county boards averaged 68 per cent. of the real valuation as determined by the ratio process." This ratio of 68 per cent. of the actual value of real estate was adopted by the board as the basis for equalization purposes. Before this meeting of the board, at its request, a tentative plan of equalization between the counties of lands and improvements had been prepared by the secretary of the state board of equalization and the secretary of the department of finance. Part of this report is as follows: "Before the assessment period began, a list of the transfers of lands in the different counties, *from July 1, 1918, to July 1, 1919,* was secured from the proper county officials. The list as

sent in gave the number of transfers, the description of the land, number of acres, consideration, and 1919 assessed value of the same acres.   When these lists were received, they were carefully checked over and transfers which plainly showed they were not *bona fide* sales were not used in compiling the average sale value for the county." The following statement was made and published by the board:

"In the matter of equalization between counties, the state board has adhered to the early announced plan of accepting for valuation purposes the average value placed on lands and improvements by the precinct and county assessing officials.   For equalization between counties, the value returned by the assessing officials of each county has been compared with the average real value, as established by the ratio process, based on *bona fide* sales from July 1, 1918, to July 1, 1919.  The equalization of the counties on the basis of the sale average was requested of the board at the meeting of the assessing officials of the counties held July 20, 1920.   The ratio process, used in correcting the sale averages, is the plan used by Wisconsin for a number of years, and Minnesota and other states have adopted the same plan.

"Under this plan of equalization, the state board has the combined judgment, as to value, of the assessing officials of the counties and of the buyers and sellers of real estate for a year's period.   *The year taken was previous to the land boom and does not cover the period of the highest prices.*

"The valuations as returned by the county boards *averaged 68% of the real value,* as determined by the ratio process, and the *state board adopted this 68%* as the basis for equalization purposes.   * * *

"That the board has adhered very closely to the above plan is shown by the fact that the average real value, as determined by the ratio process, for the state was $94.33, and the average value for assessment purposes $64.98, or 68%.

"Under this plan, the board has accepted and adopted the

average valuation of the local assessing officials. In making this equalization the state board has decreased the total value of lands and improvements of the state $91,317,444, or $18,263,549 assessed value." In 1920 land was assessed at one-fifth of its actual value.

The law was changed in 1921 so that all real property was required to be assessed in 1921 and 1922, and every second year after 1922, "which assessment shall be used as a basis of valuation for taxation until the biennial assessment." Laws 1921, ch. 125, approved March 11, 1921. This act was no doubt passed because it was believed that there had been a decline in the value of farm lands and that the former assessment was not a proper measure of the actual value of the land in 1921. In 1921, following the passage of this act, the board issued a statement to the county assessors, a part of which is as follows: "The unexpected passage of this emergency law makes it impossible for this department to follow up with any figures to assist you and you will have to rely on last year's figures, together with your knowledge of your local county, and, in addition to this, follow instructions from this department and the law governing your duties." Instructions were also sent out by the state tax commissioner to county assessors to "value any improvements that may have been added to or removed from any parcel of land or lot where such improvement is of the value of $100 or more," and that in "arriving at the value for added improvements it would seem to be equitable to *exclude from the value of such improvements the labor costs* of such improvements." It is to be presumed that the assessors followed the instructions of the tax commissioner, the secretary of the state board, and did not assess the labor costs of the improvements made during the years following these instructions.

The effect of this action of the board and of these instructions is shown by the report of the state auditor for 1922. The total assessed valuation of land and improvements for 1920 was $446,328,959, reduced to $428,894,670 by the board. This was upon a valuation of 20 per cent.

Chicago, R. I. & P. R. Co. v. State.

of the actual value. The actual value was therefore considered to be $2,144,473,350, while the assessed valuation for 1921, based on actual value, was $1,831,048,878, a reduction of $313,424,472 from the previous assessment, although this included the value of added improvements, less "labor costs." In 1922 there was again a reduction of $77,736,568, making a total reduction of $391,161,040, exclusive, presumably, of the "labor costs." The exclusion of these must have made a large added reduction. Why labor costs, which are ordinarily considered to be about one-third of the cost of building above the cost of material when the material is on the ground, should be excluded from the value of the improvements to lands, and no such exclusion of labor costs be made in the valuation of improvements made upon railroad property, is unexplained. The board made no change in the returns, so it is to be presumed that about one-third of the value of improvements upon lands was omitted from the valuation. These instructions show an intent to discriminate between these respective classes of property, which was erroneous, and, since never withdrawn, they must be considered in fixing a relative equality of valuation.

The assessment of 1920, as equalized, adopted 68 per cent. of the actual value of farm lands and improvements as the basis of valuation. The state board on July 25, 1921, passed a resolution fixing the railroad valuation at the same as that fixed by the board in May, 1920, reciting: "Considering the fact that land and improvements outside of the railroad right of way, in 1920, was increased approximately 62 per cent. over that of the prior year, and it having been assumed by the board at the time of fixing the valuation of the railroads in May of 1920 that the general average increase obtained in the state would not exceed 40 per cent., and for a further reason that the land constituting the right of way of the railroad companies is, to the minds of the board, a better grade of land than the general average in the state, and is improved to the extent that it is graded for the accommodation of the rolling stock of the companies, and to which no consideration has here-

tofore been given, and from the fact that the average reduction over 1920, per acre, as returned by the assessing authorities is approximately 15.51 per cent., that by allowing the railroads to be and remain as fixed by the state board heretofore in May, 1920, will result in a fair and an equal valuation as compared to farm lands generally in the state." We have not been able to ascertain on what, if any, evidence this finding was made.

In 1922 the assessing resolution adopted merely expressed in general terms that the board, having taken into consideration all the facts required to be supplied by the railroad companies, from all the information which they were able to obtain, "do hereby ascertain, appraise, fix and assess for the purpose of general taxation the *full actual value* of the property of each of the several systems or companies in the state of Nebraska as hereinafter recited," fixing the value of the property of complainant at $10,694,326. There is in evidence a formula which was used by the state board in 1922 in determining the value of the property of appellant in this state, which is as follows:

### Rock Island.

| | |
|---|---|
| "Net Earnings in Nebraska................$ | 118,480.83 deficit |
| Assessment ............................... | 11,502,985.00 |
| Six per cent. of which is...................... | 690,179.10 |
| This added to deficit gives................... | 808,659.93 |
| This deducted from $11,502,985 gives................................. | 10,694,326.93 |

Or assessment for 1922."

The exhibit was received without objection, but neither complainant nor counsel for the state board have been able to explain why this manner of assessment was adopted.

On June 15, 1923, the following resolution was adopted by the board:

"Whereas, the various railroad companies operating in Nebraska have requested of this board a reduction in the valuation of their property for assessment purposes this year, and whereas, it is not possible under the statute to revalue farm property and other real estate until next year,

and whereas, the records disclose that the percentage of increase in the assessed valuation of farms, homes and other forms of real estate has been out of proportion to that of other property, and that the percentage of the taxes paid by the railroads is not in excess of their proportionate share of the total taxes paid by all classes of property, be it there-, fore resolved, that the application for a reduction in the valuation of railroad property be denied."

The board also resolved that it "do hereby ascertain, appraise, fix and assess for the purpose of general taxation the *full actual value* of the property of each of the several systems or companies in the state of Nebraska as hereinafter recited: Chicago, Rock Island & Pacific Railway Co. 245.51 miles of track; total actual value $10,694,409." At the hearing on the complaint it was stated by the secretary of the board that this resolution was based upon a table prepared by him. This table is in evidence as exhibit No. 9. It compares the assessed valuation and the actual valuation of farm lands and improvements, town lots and improvements, and railroad property from 1902 to 1922, inclusive. The statement purports to show that the assessed valuation of farm lands from 1902 to 1920, inclusive, increased 377.62 per cent., while the increase in the value of railroad property was only 136.4 per cent. One of the tax experts of the complainant testified that he had made an analysis of the figures in exhibit No. 9. He called attention to the fact that in 1902—the year in which the secretary takes the actual value as five times the assessed value, and from which he draws the conclusion that from 1902 to 1922 the increase in value of farm lands and improvements was 377.62 per cent.—land was only assessed at about one-tenth of its value, instead of one-fifth. The new statute requiring one-fifth of the value to be taken was not in force until September, 1903. So that in this respect the percentage of increase submitted to the board and adopted by it as a basis of comparison with the increase in the value of railroad property as assessed by the state board is fallacious. He further testifies that the increase in railroad mileage

between 1902 and 1922 was 526.98 miles, or 9.3 per cent., while the increase in acreage of farm lands between 1902 and 1922 was 41.4 per cent., and that the average assessed value of improved land in Nebraska for 1902 was $3.71 an acre as shown by the report of the state auditor for that year, page 159.

A number of affidavits from taxpayers in many counties of the state are in the record, substantially to the effect that the assessed valuation in 1922 was 100 per cent. of the real value of the land, and that lands have decreased in value since that time.

Objection was made by the state that the railroad companies did not at the time when the assessment of real estate was made, that is, 1922, object to these assessments. But the record shows that complaint was made in 1922, and that statistics were produced showing a disproportion between the sales value and the assessed valuation of lands, but that the 1922 assessment was made as hereinbefore set forth. From a consideration of all the evidence, and in consideration of the reduction from the assessed valuation of land and improvements made in 1920, which assessment was made, as the board recites, "before the boom period of land sales," and which was only 68 per cent. of the actual market value of the lands, and the later omission of labor costs in the valuation of improvements, we are convinced that the percentage of assessed valuation of lands and improvements to actual value remains about as it was in 1920.

We must now consider upon what basis the assessed valuation of the property of the complainant was made, and whether, as the board recites in its resolutions of 1921 and 1922, it is based upon the actual value of the property. The law requires that all property be assessed "at its actual value," which is defined to be "its value in the market in the ordinary course of trade." Comp. St. 1922, sec. 5820. If, however, as between two classes of taxpayers, the property of each is assessed at a lower value but at the same proportion of its actual value, there is no ground for complaint on the part of either. But if the property of one is

valued at its actual value and that of another at only 68 per cent. of its actual value, inequality results and an unjust and unlawful exaction is made. *State v. Osborn,* 60 Neb. 415. At the time the tentative assessment of June 15 was made, the state board had before it the report of the complainant required to be made by the statute. Comp. St. 1922, sec. 5841. This report, with supplementary information, shows the entire mileage of the system to be 7,635.13. It is conceded by the state that the total mileage of track operated by the complainant in this state is 250.41, of which it owns 241.51 miles. The report shows that there is $129,556,489 of paid-up capital stock, that its actual market value is $78,411,431.76, and the total amount of obligations, including notes given for equipment, is $262,411,-305.98. In addition to this, the report contains the number of acres of right of way, an enumeration of property subject to be locally assessed, situated outside the right of way, and also an account of the equipment used in the state. We are unable to determine upon what basis the tentative assessment was made by the board. At the later hearing on the complaint, the complainant introduced exhibits Nos. 1 to 5, inclusive, estimating the value of the entire line on five different bases—the par value of stocks and bonds, market value of stocks and bonds, the value of the line as represented by the net railway operating income capitalized at 7 per cent., the value as represented by the annual rental paid by the government capitalized at 7 per cent., and the property investment as determined by Ex Parte 74 of the interstate commerce commission. These values range from 199 millions in gross figures to 375 millions, which represents the par value of the stocks and bonds and equipment notes.

A number of decisions have been cited as to what elements should govern in the valuation of railroad property. There seems to be some conflict as to the proper rule to be adopted, especially with regard to valuation for rate making purposes. We believe that, in reviewing the action of the board, we must consider only those elements of value, the existence

of which rests upon the facts in evidence. We may not act upon mere conjecture or theory, which, though the theory may be sound, can only be apprehended by an explanation made by some witness conversant with the intricacies of railroad accounting. No such explanation was made. The following methods of valuation are presented by the record. They do not possess all' the elements or factors generally required by the courts, but they are all that were before the state board, and, since we are merely reviewing their action, we cannot consider any others.

The market value of the corporate stock of the railroad company, together with the value of its bonds and of its outstanding obligations for the purpose of equipment, represent in a sense the market value of the entire property, although other elements should enter into the valuation, since the value of stocks and bonds fluctuates frequently from extraneous causes. The report to the state board shows that the market value of the stock is $78,411,431.76; that the total amount of the funded debt and outstanding equipment notes is $262,411,305.98, making the total indebtedness and the market value of the stock $340,822,-737.74. Again, the net railway operating income for 1922 is in evidence. The value of the property may in one sense be considered to be the amount of capital investment which will produce that amount of income at the rate of 5¾ per cent. per annum, which is considered by the interstate commerce commission to be a fair rate of return on such an investment, or at 6 per cent. which we consider to be a fair rate. It was stipulated in open court by the parties that the net income from the operation of the railroad for 1922, after payment of taxes, equipment rents, track rents, and operating expenses, was $13,934,468.51. Assuming that a net income of 6 per cent. per annum is a fair return upon the capital invested, we may consider as one estimate of the value $232,241,141.83.

There is a discrepancy between the original report to the board and exhibit No. 2 introduced at the hearing, with respect to the market value of the stocks and the amount of

the funded indebtedness and equipment notes. In the original report this is placed at $340,822,737.74, while in exhibit No. 2 it is placed at $286,981,456. The par value of the stocks and securities of the entire system is $375,529,-812. The evidence shows that $10,463,501 of the stock was not paid up, leaving the total par value of the paid-up stock and the outstanding obligations $365,066,311. A statement made to the interstate commerce commission as of October 1, 1919, shown in exhibit No. 5, places the entire property value at $343,802,202. Averaging all of these figures, we are satisfied that the value of the entire system is not less than about 314 million dollars. None of these outstanding obligations include claims for damages, wages, interest, and other liabilities which are payable out of income and which do not represent investments in property.

There are other elements of value which, under the decisions, should or might be considered, but we are confined to the proofs which were actually before the board. The rule in *Smyth v. Ames,* 169 U. S. 466, 547, stated by Mr. Justice Harlan, is as follows: "The original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property."

In *State v. Savage,* 65 Neb. 714, 757, the question how the value of railroad property shall be assessed is considered, and it is said by Judge Holcomb: "While conceding that the market value of the stocks and bonds of a railroad corporation may not always furnish the best evidence, or the exclusive criterion of the value of the corporate property, it cannot, we think, be gainsaid that the amount and value of such stocks and bonds, if not subject to extraneous in-

fluences would very generally, if not uniformly, be a most important factor in the determination of the value of the corporate property which they represent, and should receive due consideration, with other pertinent evidence, in reaching a correct conclusion .as to the actual' value of such property."

In *State Railroad Tax Cases,* 92 U. S. 575, 605, it is said by Mr. Justice Miller: "It is therefore obvious that, when you have ascertained the current cash value of the whole funded debt, and the current cash value of the entire number of shares, you have, by the action of those who above all others can best estimate it, ascertained the true value of the road, all its property, its capital stock, and its franchises; for these are all represented by the value of its bonded debt and of the shares of its capital stock."

. The next important question is how much of this. value should be allocated to the property of the complainant in Nebraska. The report shows that the main track mileage operated in this state is 250.41. There being no evidence to show any difference in the relative value of the mileage in this state as compared with that in other states it is not improper under this state of the record to distribute the value upon a mileage basis. In *Wallace v. Hines* 253 U. S. 66, and *Davis v. Wallace,* 257 U. S. 478, in which an excise tax, which was apportioned on the ratio which the mileage within the state of North Dakota bore to the entire mileage of the system, and in which the bill of complaint alleged that on account of the differences of value of the line in the region through which the road passed in North Dakota, from its value in the more densely populated portion of the country in which its valuable terminals lay, the value of the mileage in North Dakota was very much less than the value of the mileage in other states, the supreme court of the United States held that, under these facts, the ratio which the mileage in North Dakota bore to the entire mileage was. not a fair method of determining the value of that .part of the system lying in North Dakota.

The evidence upon which the state board of equalization

acted in this case shows no such disparity in value or difference in conditions between the mileage of the Rock Island road in Nebraska and in other states. So far as appears there is nothing unjust or unfair in ascertaining the value of the property of the railroad in Nebraska by comparison of the amount of mileage of main track in this state with the amount of mileage of main track operated in its entire system. The rule is as stated in *Fargo v. Hart,* 193 U. S. 490: "A state cannot tax the privilege of carrying on commerce among the states. Neither can it tax property outside of its jurisdiction belonging to persons domiciled elsewhere. On the other hand, it can tax property permanently within its jurisdiction although belonging to persons domiciled elsewhere and used in commerce among the states. And when that property is part of a system and has its actual uses only in connection with other parts of the system, that fact may be considered by the state in taxing, even though the other parts of the system are outside of the state. The sleepers and rails of a railroad, or the posts and wires of a telegraph company, are worth more than the prepared wood and the bars of steel or coils of wire, from their organic connection with other rails or wires and the rest of the apparatus of a working whole. This being clear, it is held reasonable and constitutional to get at the worth of such a line, in the absence of anything more special, by a mileage proportion. The tax is a tax on property, not on the privilege of doing the business, but it is intended to reach the intangible value due to what we have called the organic relation of the property in the state to the whole system." See *Cleveland, C. C. & St. L. R. Co. v. Backus,* 154 U. S. 439; *Illinois C. R. Co. v. Greene,* 244 U. S. 555.

On the basis of the value of 314 million dollars for the entire system, the value per mile of the operated main trackage is $40,951. The operated mileage in Nebraska is 250.41, which, upon a mileage allocation, makes the total value of the property of the complainant in Nebraska $10,254,539. The property outside of the right of way

locally assessed, which is not assessable by the state board, amounts to $70,273, leaving the value of the assessable property in this state, on this basis, $10,184,266. Some of the lines operated by complainant are owned by subsidiary companies of which it owns all or a large part of the stock, some are leased lines, and upon some of the operated property it has merely trackage rights. However, value inheres in both the trackage rights and in the leases. The value of the whole property must be considered. The statements of value contained in this opinion are only approximate, and not intended to limit or control the state board if or when it becomes necessary to assess or reassess the value of complainant's line of railroad in Nebraska. The board is entitled to ascertain all the facts which are necessary upon which to base its judgment as to value, and it is the duty of the railroad company whose property is to be assessed to make a full, fair and complete statement of all relevant facts, and to assist the board to make a fair valuation. The subject of the valuation of railroads is a difficult one. Neither railroad commissioners, nor taxing authorities, nor courts have as yet arrived at settled or infallible rules or criteria for the ascertainment of actual value of such property. Approximation is all that can reasonably be expected.

The Constitution, section 1, art. VIII, requires that "taxes shall be levied by valuation uniformly and proportionately upon all tangible property and franchises." It is impossible to secure absolute uniformity in the valuation of property for taxation, more especially where it belongs to different classes. The most that any assessing officer or board can do in this direction is to make a valuation in such a reasonable manner, having regard to all the circumstances, as to show that the intention was not to create disparity but to secure uniformity. And if, after indulging the presumption that the assessing authorities have been endeavoring to perform their difficult and arduous duties in good faith and with impartiality, the differences and discrepancies are not so great or so obvious as to indicate that there has been a substantial error to the prejudice of the

complainant, the assessment will not be disturbed. *State v. Savage*, 65 Neb. 714. On the other hand, if it is shown by the evidence that the property of one person, individual or corporation, has been assessed out of a reasonable and fair uniformity with that of other property and that the disparity is so great that it violates the requirement of the Constitution, then a reviewing court may and should remand the proceedings to the assessing board for correction in order to make the percentage of assessed valuation to actual valuation of all classes and kinds of property as nearly as possible the same. *Sioux City & P. R. Co. v. Washington County*, 3 Neb. 30; *McGee v. State*, 32 Neb. 149; *State v. State Board*, 81 Neb. 139; 2 Elliott, Railroads (3d ed.) 280, 281, 282. As to error from such tribunals, see *Mathews v. Hedlund*, 82 Neb. 825; *Munk v. Frink*, 75 Neb. 172.

The valuation for the year 1923 of lands and improvements, as shown by the records of the tax commissioner, is $33,964,244 greater than the valuation for 1922. The total reduction from the assessed value of such property in 1920 (which valuation, as the board has stated, was made before the great increase in land values) is $357,196,797, a reduction of about 16 per cent. from a valuation made on a basis of 68 per cent. of actual value. From a careful consideration of all the facts in evidence, we are of the opinion that the valuation of the property of complainant lacks reasonable uniformity with the assessment of lands and improvements; that, as the record recites, the railroad property has been assessed at "full actual value," and that the other class mentioned has been assessed at a much lower percentage. This being the case, the property of complainant should be revalued as nearly as possible at the same percentage of actual value as all other property.

Having come to this conclusion, the finding and order of the state board of equalization and assessment of the value of complainant's property is set aside and the proceedings are remanded to that body for further proceeding in accordance with law. While section 5882, Comp. St. 1922, seems to apply specifically to where "any tax or part there-

of levied under the provisions of this article shall be. adjudged illegal and nonenforceable, or shall be set aside by any court of competent jurisdiction on any ground whatever," and specifies what the duty of the board shall be as to reassessing and redetermining the value in such case, the procedure prescribed for such cases seems to be well adapted to such a case as this, where the assessment of the property of. the complainant has been decided to· lack uniformity with that of other classes of property. We desire in this connection to call special attention to section 5842, Comp. St. 1922, which gives the board power to consider all facts and information not contained in the reports made by the railroad companies. Where such information is considered, the source from which it has been obtained should, so far as possible, be mentioned in the record, so that a reviewing court may consult the same sources and thus stand in the shoes of the assessing body.          (

REVERSED AND REMANDED.