CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Appellant

v.

GILLIS et al., Respondents

(148 N.W.2d 581)

(File No. 10313. Opinion filed February 14, 1967)

**George M. Hollander,** Chicago, Ill., **M. T. Woods,** Sioux Falls, for appellant.

**Frank L. Farrar,** Atty. Gen., **John P. Dewell,** Asst. Atty. Gen., Pierre, for respondents.

BIEGELMEIER, Judge.

This appeal involves the 1963 value of a railroad for tax purposes. Pursuant to SDC 57.1305 the Commissioner of Revenue (SDC 1960 Supp. 57.01A05) having the powers of Director of Taxation fixed the true and full value thereof. Appellant railroad appealed to the State Board of Equalization and from its ruling to the Circuit Court of Lincoln County. From a decision of that court affirming the Board, appellant railroad has appealed to this court. The legislative guide for this assessment which has

been in effect without change since 1939 appears in SDC 57.1305 which is set out in the margin.[1]

Some earlier proceedings involving that section are pertinent here. SDC 57.1306 requires the assessing authority to give notice of the assessment made (value fixed) by it and a time to appear and be heard thereon before the State Board of Equalization. It appears to have been the practice of the Director of Taxation, now the Commissioner of Revenue, to determine such value, which he termed a "Tentative" value, give notice thereof and the Board to determine a "Final" value at the hearing. That has resulted in the following:

| YEAR | TENTATIVE | FINAL |
|------|-----------|-------|
| 1955 | $ 8,211,334 | $7,921,547 |
| 1956 | 7,921,547 | 7,925,469 |
| 1957 (1) | 12,393,289 | 7,404,695 (3) |
| | | 7,889,411 (1) |
| 1958 (1) | 10,137,764 | 7,494,836 |
| 1959 (1) | 10,916,924 | 7,195,041 |
| 1960 (1) | 11,599,994 | 6,988,160 |
| 1961 (2) | 11,947,723 | 7,281,292 |
| 1962 (2) | 12,010,546 | 6,573,984 |
| 1963 (2) | 9,361,737 | 5,617,042 (4) |

1. "57.1305 Assessment: when and how made. The Director of Taxation shall assess the operating property of railroads * * * each year * * *

"The Director of Taxation shall, in determining the true and full value of the property assessed by him, value all the property of any railroad company as a unit, but shall make due allowance for any nonoperating property.

"For the purpose of determining the * * * value * * * the Director of Taxation shall take into consideration the actual or market value of the shares of stock outstanding, the actual or market value of all bonds outstanding and all other indebtedness as shall be applicable, for operating the road. In determining the market value of any such stock or indebtedness the Director of Taxation shall consider quotations for the next preceding five years; the net railway operating income of the company during the five calendar years preceding the assessment date; and the Director of Taxation may take into consideration any other information or data of any kind or nature which he may deem material in arriving at the true and full value of the property. The Director of Taxation, as an aid to this determination of value as aforesaid, may, if he sees fit, call upon the Public Utilities Commission of the state of South Dakota for any information and facts which said Commission may have concerning the property of any railroad company in this state, and it is hereby made the duty of said Public Utilities Commission to furnish such information upon request. The assessment by the Director of Taxation shall include capital stock and all other property of railroad companies, except such property as is found by the Director of Taxation to be nonoperating property as hereinbefore defined.

"If any railroad company owns or uses operating property partly within and partly without this state, the Director of Taxation shall determine the value of the entire operating property of such railroad and shall allocate or assign a part of said value to this state by the use of such factors or methods as are reasonable and equitable."

(1) These figures include the Omaha Railroad property (never valued at over $500,000) commencing in 1957

(2) and include the M&StL property commencing in 1961

(3) C&NWRyCo alone valued at $7,404,695 in 1957

(4) Department of Revenue Data Work Sheets show 60% factor first expressly applied in 1957 in Exhibit P 26 A.

Effective March 18, 1957 the legislature amended SDC 57.0334 by adding the clause emphasized therein as follows:

"Determination of value: directions. All property shall be assessed at its true and full value in money **but only sixty per cent of such assessed value shall be taken and considered as the taxable value of such property upon which the levy shall be made and applied and the taxes computed.** In determining the true value of real and personal property the assessor * * * shall value each article or description (of property) by itself and at such a sum or price as he believes the same to be fairly worth in money. * * *" SDC 1960 Supp. 57.0334.

For the year 1957 when this statute became effective it appears the Director increased the Tentative value about 60% over that of 1956. Two railroads, the Milwaukee and appellant brought original mandamus actions in this court against Gillis and others to require them to apply the 60% factor provided in the quoted amendment which Gillis contended did not relate to railroad operating property. This court held it did apply and as to Milwaukee required the Director to apply it and accordingly reduce the taxable value. Chicago M. St. P. & P. R. R. Co. v. Gillis, December 7, 1962, 80 S.D. 50, 118 N.W.2d 313. Under the narrow issues presented in mandamus and the stipulated facts as to the North Western, the court denied the writ because it was not shown (see 1962 figures) the taxable value was in excess of 60% of true and full value. Chicago & N. W. Ry. Co. v. Gillis, 80 S.D. 57, 118 N.W.2d 316. See also Chicago & N. W. Ry Co. v. Gillis, 80

S.D. 617, 129 N.W.2d 532 where the court held this action challenging the 1962 assessment was barred by the prior mandamus judgment. The record here now (Exhibit P 27 A) shows the 1962 computations and results reached were:

Tentative Value:

Five year average of stocks and bonds allocated to S.D. (3.68%) $ 6,300,234 (48%)

Net revenue capitalized at 7% allocated to S.D. 2,247,523 (17%)

These two figures were then added and total $ 8,547,757

This sum was then divided by 2 and is $ 4,273,879 .

To the figure was added 33 1/3% of the Public Utilities Commission (P.U.C.) depreciated cost of $23,210,000 or 7,736,667

Resulting in a Tentative value of $12,010,546

 \* \* \*

Appellant was notified that on this basis its equalized taxable assessment was $ 6,594,879

This was in turn arrived at on the basis of the following formula:

50% of stock and bonds and capitalized revenue above $ 4,273,879

To which was added 10% of P.U.C. depreciated cost or 2,321,000 (35%)

For a total and taxable value of $ 6,594,879

The Board of Equalization deducted from this 20,895

Leaving the equalized taxable value of $ 6,573,984

For 1963 appellant was notified by the Commissioner of a Revised true and full value of $9,410,020 which on appeal and hearing by the Board of Equalization reduced to $9,361,737 with a resultant 60% taxable value of $5,617,042. This 1963 value was based on a different formula and computation shown by record Exhibit P 26 A as:

Railroad System:

| | | |
|---|---|---|
| Stock and Bonds—5-year average | $161,756,000 | (23%) |
| Capitalized value of net railway operating income at 6 1/2% | 47,102,500 | (6%) |
| I.C.C. depreciated costs* | 507,672,589 | (71%) |
| Total | 716,531,089 | |
| Divided by 3 equals | 238,819,812 | |
| Apply a 3.92% factor of road in S.D. (not here in dispute) | .0392 | |
| | $ 9,361,737 60% | |
| Taxable Value | $ 5,617,042 | |

\* I.C.C. instead of P.U.C.

————O————

The evidence in the trial court was voluminous, including over 75 exhibits with sub-exhibits showing capitalization, earnings, debt, tonnage hauled, traffic density and other data of appellant and of railroads in this state and the United States, appellant's Annual Reports to the South Dakota Department of Revenue of over 200 pages and charts showing its property and affairs, its Report to the Interstate Commerce Commission of similar scope and other books and reports. Any review of the hundreds of pages of evidence or exhibits would extend the opinion to undue length; even a brief mention would omit much. Some facts were stipulated and other testimony by deposition and wit-

nesses at the trial covered a wide field ranging from statistical matters and records, the history and changing economic position of railroads as well as the proper guides for valuing railroad property and the value of appellant's property. Appellant's witnesses were William Krucks, H. Clyde Reeves, Browley Travis and Charles M. Chapman. Generally all were competent, had many years experience and study in the field of accounting and taxation of utilities and railroads, as members or counsellors for state and national tax officials and were nationally recognized authors of texts and experts on the subject. Their qualifications, experience, employment and offices held were set out in separate exhibits of from one to three pages.

Their opinions of the value of the operating property of that part (3.92%) of the North Western system in South Dakota were:

| | |
|---|---|
| Krucks | —$4,000,000 to $4,100,000 |
| Reeves | —$4,100,000 |
| Travis | —$3,770,000 to $4,000,000 |
| Chapman | —$3,770,000 to $4,000,000 |

They gave little or no consideration for cost and based their values mainly on the guides expressly named in SDC 57.1305, i. e., the 5-year average of stock and bonds and net operating income. Their opinions reflected a thorough study and knowledge of the company's records, property, equipment and roadbed.

 The Board of Equalization (here referred to as Board) witnesses were Douglas Misfeldt and Paul Schmitt, Board employees, defendant Bruce Gillis, Commissioner of Revenue and Sterling Clark, Board Chairman. Schmitt's testimony generally was assessed value and sale prices of property sold by North Western; these were bought and sold as nonoperating property so the evidence was not relevant and is not here considered.[2] The other witnesses testified as to their roles in making calculations, preparing and approving the formulae. North Western's

---

2. Attention is called to SDC 57.1301 which assigns the duty to the Director of Taxation (now Commissioner of Revenue) to assess only its " 'operating property' " being that which is "actually and necessarily used in the operation of its line". Property not so used should be assessed by local assessors.

evidence, perhaps more in detail and of wider scope, its contentions and argument generally resemble those made by it in their Nebraska and Illinois litigations and appearing in the opinions hereafter mentioned.

## I. VALUATION

■ Appellant's first contention the valuation is more than the "true and full value", these words appearing in statutes relating thereto, SDC 1960 Supp. 57.0334 as to all property and SDC 57.1305, supra, as to railroad operating property. SDC 57.0301 defines them as "the usual cash selling price" which was said to be the price it would bring if offered for sale on the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. Sheraton-Midcontinent Corporation v. County of Pennington, 77 S.D. 554, 95 N.W.2d 892. It is akin to eminent domain willing seller—willing buyer guide for which see City of Huron v. Jelgerhuis, 77 S.D. 600, 97 N.W.2d 314. The Constitution (Art. XI, § 2) requires not only that taxes be uniform but also "valuation * * * for taxation purposes shall never exceed the actual value thereof". Those principles are clear, but in many cases difficult[3] to apply. Railroads are not commonly bought and sold on the market[4] and recent transactions have been by mergers, purchases by another road which partly owned or controlled it and these by complicated stock exchange and debt assumption plans.

Under SDC 57.1305 note 1, supra, the assessing official was authorized to value and assess only the operating property of appellant railroad as a unit. In determining the value, the statute required that he "shall" take into consideration (1) the market value of the stock, bonds and all other indebtedness applicable for operating the road and (2) its net railway operating income—both for the preceding 5 years. It then reads he "may" take into consideration any other information or. data of any kind or nature which he may deem material in arriving at the true and full value of the property.

---

3. See note 7, infra.
4. Nor were hotels in Rau v. Fritz, 81 S.D. 311, 134 N.W.2d 773.

North Western claims respondents' evidence supports only what they did in the erroneous use of a historic I.C.C. depreciated cost in a formula that was representative of some past time adjusted to an arbitrary figure without allowance for obsolescence; that 50 to 100 years ago when they were being built and a cost figure established railroads occupied a vital part of the transportation field—were a virtual monopoly, that now due to competition of (and, it may be added, subsidy by the national, state and local governments) other modes of transportation, i. e., buses, trucks, airplanes, pipe lines, etc. as well as private automobiles and trailers, their business has declined and their station[5] in the economy drastically changed so that historic costs have no place at all in fixing values; that this is true as to appellant road in a greater degree than railroads generally and the specifically stated criteria (1) and (2) properly reflect its value and the only testimony as to value (which is based substantially on that premise) is from its witnesses.

■■■ It is conceded respondents' 1963 formula of adding the three items: (1) 5-year average stock and bonds; (2) capitalization of earnings at 6 1/2% and (3) I.C.C. depreciated cost set out above give a weight of 23% to (1), 6% to (2) and 71% to (3). Appellant points out the two criteria[6] expressly stated in the statute each have 1/3 and 1/11 of the last not so mentioned and, as to the appellant, this distorts the other two more accurate criteria which harmonize with its testimony of value and results in a figure in excess of true value. Exhibit 31 shows application of the formula results in an assessment of appellant road of 229% over its stock—bond and capitalized income total while other South Dakota roads range from 144% to 168% and an average of 155%. Apropos at this point is the following comment of the Nebraska Supreme Court:

---

5. History relates they not only were a vital part of the development of our nation and beneficiaries of U. S. and local governmental land grants, subsidies and tax exemptions, 1965 Wis.L.R. 713, but wielded financial and political power. In this state it is said North Western used its influence to locate the State Capital by giving free passes on its trains to visit Pierre. Their status has changed; as even the old styled Railroad Commission is now the Public Utilities Commission. SDC 52.0101.

6. Rau v. Fritz, supra, and Sheraton-Midcontinent Corporation v. County of Pennington, 77 S.D. 554, 95 N.W.2d 892, without statutory direction declare income producing capacity a factor in fixing value for tax purposes. See also 51 Am.Jur., Taxation, § 834.

" 'There are no settled or infallible rules for the ascertainment of the actual value of railroad property for the the purpose of taxation. * * *.' * * * 'The subject of the valuation of railroads is a difficult one. Neither railroad commissioners, nor taxing authorities, nor courts have as yet arrived at settled or infallible rules or criteria for the ascertainment of actual value of such property.' "[7]

Concerning the use of cost, the evidence and general knowledge shows that railroad reorganizations over the years, the I.C.C. in 1917 and some tax authorities have discounted its value and weight in tax proceedings. Evidence of sales 75 years ago would be regarded too remote in time and no bearing upon the question of present value in ordinary condemnation proceedings, though evidence of a recent sale is admissible, State Highway Commission v. Hayes Estate, 82 S.D. 127, 140 N.W.2d 680; 27 Am.Jur.2d, Eminent Domain, § 428. Valuation of railroads does however present difficult and complex problems as they are not commonly bought and sold, so of necessity other evidence, including the three mentioned, may be given some consideration and effect. The two specific criteria noted do reflect value, yet due to management, temporary regional or national economic conditions or other reasons they may not, without other guides, show a stable long-term value.

Respondents assert the valuation must be approved as respondents used judgment in arriving at the formula. This does not follow as examples of values reached in accord with the Board's different formulae are so disparate as to negate claim of finality. Applications of the various formulae will be alluded to and compared.

For 1962 respondents first added the two required criteria, divided by 2, then added 1/3 of the P.U.C. (S.D.) cost to get ten-

---

7. In re Chicago, Burlington & Quincy Railroad Co., 170 Neb. 77, 101 N.W.2d 856, 860, quoting from Chicago, R. I. & P. Ry. Co. v. State, 111 Neb. 362, 197 N.W. 114, See Ewert v. Taylor, 38 S.D. 124, 140, 160 N.W. 797, 800, and Rowley v. Chicago & N. W. Ry. Co., 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222.

tative or true value. Rather than apply the 60% factor required by law, one-half (1/2) of the first two criteria was added to 10% of the above P.U.C. cost to arrive at the taxable value.

For 1963 a different formula (Exhibit P 27 A above) was adopted. Comparison of weights of the criteria for these two years indicates

(1) Stock and Bonds was reduced 48% to 23%;

(2) Capitalized income from 17% to 6%, and

(3) P.U.C. cost raised from 35% to I.C.C. cost of 71%.

The total of (1) and (2) was reduced from 64% to 29%. Most of the differences did not come from a change in the items used or the amounts, but whether the first two are added together, divided by 2 and then added to a percentage of cost (1962) or whether the three are added and divided by 3 (1963).

If the 1962 method was used with the 1963 amounts, i. e., adding items (1) and (2), dividing by 2, then adding 1/3 of I.C.C. cost (3) a system valuation of 274 million (South Dakota $10,740,-800) results as true value compared with the 238 million under review. Respondents would support that result for at oral argument in answer to a question stated use of a formula adding stock and bonds to income, dividing by 2 (or 104 million), added to I.C.C. cost of 507 million, dividing this total by 2, resulting in a value of over 305 million (South Dakota $11,995,000) would be proper use of formula and thus judgment. This last mentioned formula gives 17% weight to criteria (1) and (2) and 83% to cost.

█ While this court in the mandamus proceeding inferred the Commissioner, by the term "Tentative" value, meant "true and full" value, the opinion expressly states, "but this should not be construed as approving the formula utilized" by the Commissioner. Chicago M. St. P. & P. R. R. Co. v. Gillis, 80 S.D. 50, 56, 118 N.W.2d 313, 316. We believe the legislature did not intend to grant assessing officials unbounded authority to use any

formula[8] or arithmetical calculation they chose nor give undue weight to unspecified criteria as compared to those specifically noted in SDC 57.1305.

Many of the cases involving valuation of railroads for tax purposes are reviewed in three opinions of the Nebraska Supreme Court, In re Chicago, Burlington & Quincy Railroad Co., 170 Neb. 77, 101 N.W.2d 856; In re Chicago and North Western Railway Company, 170 Neb. 106, 101 N.W.2d 873, and In re Union Pacific Railroad Company, 170 Neb. 139, 101 N.W.2d 892, and of the Illinois Supreme Court, Chicago & North Western Ry. Co. v. Department of Revenue, 6 Ill.2d 278, 128 N.E.2d 722.

The Nebraska cases involved the 1959 assessments and the factual background of the 1953-1959 valuations of the Board of Equalization seems to have had some bearing on the result. The court, which considers the appeal on the record made before the administrative State Board, approved values arrived at by a formula similar to that before the court here, but reversed Board action which raised earlier valuations by applying a 1.4286 factor to them. However, there are at least two differences in the Nebraska appeal and the case at bar. First, the Nebraska statute, Section 77-112, R.R.S.1943, subsection (4) requires the Board to consider "reproduction cost less depreciation" with the stock and bond and capitalized earnings criteria; which statute that court adverted to in In re Chicago and North Western Railway Company, 101 N.W.2d 886. The Board used the investment account (cost) which the railroad agreed was in lieu of the quoted reproduction requirement. Second, it appears the Board had reduced this cost item not only by the recorded depreciation but an added 20% before including it in the formula in the Chicago, Burlington & Quincy Railroad Co. (101 N.W.2d at 861), the Chicago and North Western Railway Company, (101 N.W.2d at 886) and 15% for the Union Pacific Railroad Company (101 N.W.2d at 897). We mention, in passing, the Nebraska court in the Burlington opinion holding as it did that the assessing authority

---

8. Mr. Justice Butler writing for the court in Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U. S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890, stated the ascertainment of values is not a matter of formulae but reasonable judgment having its basis in a proper consideration of all the relevant facts.

might use and consider depreciated historical cost,[9] less deductions noted, nevertheless said an assessment about 50% more than the stock and bond total as "in defiance of that recognized standard of value" which is a "fair method of ascertaining its value" and the "earnings of a railroad are evidence of a most important character in determining the value of the railroad". Further, in the North Western opinion it quoted other courts approving one or all the criteria, in part saying the weight to be given facts and statistics is that which " 'reasonably they might be deemed to have' "; that of " 'original cost, * * * stock and bonds, and earning capacity * * * the two last named are of the greatest significance' " and " ' net revenue * * * and * * * the current market value of its stocks and bonds are among the most persuasive and authoritative—far more so than the cost' ", and noting " 'The case cited by no means holds that earning capacity is completely to overshadow other factors.' "

The Illinois statute is similar to ours, but specifically requires the railroad to report the reproduction cost of the road in that state. The court approved a valuation arrived at on a formula again similar to respondents' here—where, however, that formula valuation of $97,730,000 had been reduced $10,730,000 (11%) by the assessing officers and a further $250,000 at the hearing to a net of $86,750,000. The reductions were made as the

9. Though counsel have not explained the origin of this Depreciated Cost item, referred to in one of the Nebraska Supreme Court opinions as having been fixed by the Interstate Commerce Commission (In re Chicago and North Western Railway Company, 170 Neb. 106, 101 N.W.2d 873 at 885) it warrants examination. The Commission, an administrative creation of the United States (49 U.S.C.A. § 11), in 1928 made a value determination of the North Western as of June 30, 1917 for "rate-making purposes", wherein it said, "Value for rate making is not synonomous with value for purchase and sale". Chicago and North Western Railway Company, et al., 137 I.C.C. 1, Valuation Docket No. 898. This decision covers 368 printed pages of the corporate and financial history of the original 145 railroad companies which resulted in the North Western system. The Commission has at least two kinds of value. One is "economic value" which is the value used for "financial reorganization purposes", another is "value for rate-making purposes". Different factors are considered for fixing these two values and the latter obviously may, and ordinarily will differ from economic value. Chicago G. W. R. Co. Reorganization, 247 I.C.C. 193. That valuation of a carrier's property for rate-making purposes is not intended as a buying and selling price and that a railroad may have one "full and true value" for tax purposes and another for rate-making purposes has been approved and stated by the courts. Atlanta, B & C. R. Co. v. United States, 296 U.S. 33, 56 S.Ct. 12, 80 L.Ed. 25; Northern Pac. Ry. Co. v. Adams County, D.C., 1 F.Supp. 163, 173; 13 C.J.S. Carriers § 286 and cases cited in Grand Trunk Western R. Co. v. Brown, D.C., 32 F.Supp. 784 on page 795. Throughout the extensive and detailed opinion, order and appendixes in Docket No. 898 the Commission states many times the original costs "can not be ascertained" and it was fixing a "value for rate-making purposes". Both of these qualifying phrases further weaken the weight of the cost item used in the tax formula. For those interested, North Western's 1944 Reorganization appears in 257 I.C.C. 61 and prior cited reports.

State Department did not contend their findings were objectively correct in every detail or any one of the evidences or criteria were of conclusive validity. So in addition to depreciation, the Nebraska formula included a 15% to 20% obsolescence deduction and in Illinois an 11% judgment deduction from the result of the formula calculation. The Illinois court also requires a showing the valuation be grossly in excess of market value, deliberately made and a constructive fraud against the taxpayer, before the court will set aside an assessment.

A presumption exists the assessor's value is correct, which presumption does not take the place of evidence and disappears when evidence is introduced from which facts may be found. The burden of proof is on the taxpayer to prove excessive tax. Sheraton-Midcontinent Corporation v. County of Pennington, 77 S.D. 554, 95 N.W.2d 892. Under our statute the circuit court hears evidence and determines the appeal de novo on the record made in that court and exercises independent judicial judgment where excessive value is claimed. Williams v. Stanley County Board of Equalization, 69 S.D. 118, 7 N.W.2d 148. Evidence was introduced to present the question of value practically all of which was by North Western and is undisputed. While North Western's claims of error are many such as:—its testimony of value is not disputed therefore it should prevail, cost should not be used at all, etc., the crux of its justifiable complaint is the weight given cost and that in turn is that no deduction was made therein for obsolescence. In Sheraton this term was said to be "functional capital loss or diminution of economic usefulness due to 'changes in the art, shifting of business centers, loss of trade, inadequacy * * * and other things * *, apart from physical deterioration' ".

Examination of all the exhibits and evidence leads us to believe that obsolescence was present in this railroad assessment as it was in the two hotels—the Sheraton-Johnson in the last cited case and the Lincoln in Rau v. Fritz, 81 S.D. 311, 134 N.W.2d 773. What was said in those opinions applies here and we conclude, as the court did in Rau, the trial court gave insufficient consideration to the evidence of obsolescence in accepting the I.C.C. cost at its stated figure without deduction of

any obsolescence,[10] resulting in a value in excess of full and true value. It follows the evidence is insufficient to support the Findings, Conclusions and Judgment sustaining the Board's valuation.

## II. EQUALIZATION

Under this heading North Western contends the full and true value properly fixed is subject not only to be reduced to a tax value by the 60% factor SDC 1960 Supp. 57.0334, supra, as required by Chicago M. St. P. & P. R. R. Co. v. Gillis, 80 S.D. 50, 118 N.W.2d 313, but also must reduce (if less) to the same percentage other property is assessed; that other property is assessed at less than 60% of true value throughout the state and in each county where appellant's property is located.

Section 2 of Article XI of our Constitution provides: "Taxes shall be uniform on all property of the same class * * *". Since the court disapproved prior dictum to the contrary, it has adhered to and quoted the statement in Chicago, R. I. & P. Ry. Co. v. Young, 60 S.D. 291, 294, 244 N.W. 370, 372, that:

> " 'Where the unlawful discrimination results from valuing the property of one taxpayer proportionately higher than that of others, the rate levied against all being the same, the remedy almost universally given to the taxpayer against whom the discrimination exists is to reduce his valuation to the same percentage of true value used in the case of those in whose favor the discrimination was granted and compute his tax accordingly.' "
> Baken Park, Inc. v. Pennington County, 79 S.D. 156, 109 N.W.2d 898.

The parties stipulated the annual reports of the Department of Revenue for 1962 and 1963 "accurately reflect the level of real property assessments in the state of South Dakota

---

10. Cf. Erie R. System v. Walsh, 57 A.2d 217, 26 N.J.Misc. 81 (N. J. Dept. of Taxation & Finance, Div. of Tax Appeals); Village of Ridgewood v. State Board of Tax Appeals, 129 N.J.L. 121, 28 A.2d 303.

and of the several counties in the state" for those years. Those reports indicate real property is assessed statewide and by counties in varying percentages less than 60%. They do not indicate the percentage of actual value at which personal property is assessed and as much of North Western's property is personal it affords no evidence such property is assessed at other than full value. The trial court did not err refusing to reduce the valuation for tax purposes pursuant to this claim of North Western.

The judgment appealed from is reversed and the cause remanded with directions to the trial court to make findings of fact which will include the full and true value of North Western's operating property and conclusions of law on the present record within the guide lines of this opinion and enter a judgment requiring respondents so authorized to apportion and certify the appropriate portion thereof to the proper officers of counties where the railroad operating property is located.

HOMEYER, P. J., and ROBERTS and HANSON, JJ., concur.

RENTTO, J., not participating.