IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

GIFF v. SARPY CTY. BD. OF EQUAL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

NANCY J. GIFF, APPELLANT,
V.
SARPY COUNTY BOARD OF EQUALIZATION, APPELLEE.

Filed February 4, 2014.    No. A-13-345.

Appeal from the Tax Equalization and Review Commission. Affirmed.

Richard A. Drews, of Taylor, Peters & Drews, for appellant.

Michael A. Smith, Deputy Sarpy County Attorney, for appellee.

IRWIN, MOORE, and BISHOP, Judges.

IRWIN, Judge.

## I. INTRODUCTION

Nancy J. Giff appeals an order of the Nebraska Tax Equalization and Review Commission (TERC) in which it largely denied her protests of the valuation placed on her property in 2011 and 2012 by the Sarpy County assessor (County Assessor) and upheld by the Sarpy County Board of Equalization (County Board). On appeal, Giff challenges the conclusions with regard to the value placed on the land and with regard to equalization. We find no error appearing on the record, and we affirm.

## II. BACKGROUND

The present case arises out of the 2011 and 2012 valuations of Giff's property, a residential parcel located in Bellevue, Sarpy County, Nebraska. The parcel comprises 6.64 acres of land, improved with a 3,882-square-foot residence, a swimming pool, and two tennis courts. For tax year 2011, the County Assessor determined that the assessed value of the land was $118,200 and that the assessed value of the "building" was $425,938, for a total assessed value for the parcel of $544,138. For tax year 2012, the County Assessor determined that the assessed

- 1 -

value of the land was $118,200 and that the assessed value of the "building" was $392,901, for a total assessed value for the parcel of $511,101.

Giff protested this assessment to the County Board and requested a total assessed value for the parcel of $435,000 for tax year 2011 and a total assessed value for the parcel of $425,000 for tax year 2012. The County Board agreed with the values as assessed by the County Assessor.

Giff appealed the County Board's decisions to TERC. Prior to a hearing before TERC, the parties exchanged 104 exhibits and stipulated to the receipt of the exchanged exhibits. TERC held a hearing on Giff's appeals in December 2012.

### 1. GIFF'S EVIDENCE BEFORE TERC

Giff's husband, Martin J. Giff, testified on her behalf. Martin testified that he had been married to Giff and had lived on the subject parcel during all relevant times. Martin is a professional real estate appraiser and also holds a real estate broker's license.

Martin described the subject parcel as consisting of "steep, rolling hill, heavily wooded, heavy downfall of trees, very undulating." He also testified that the subject parcel is "very irregular shaped" and indicated that "[i]t has limitations in that there are washouts on the property that are created because of the steep grade and runoff." He testified that the residence was located "on the peak of the hill and the only area that you could build a home, that's flat enough to build a home on." He testified that of the total 6.64 acres of the parcel, only approximately "an acre" was buildable.

Martin testified that the tennis courts located on the subject parcel are "obsolete." He testified to gaps in the surface of the courts that "are approaching seven or eight inches wide," and he indicated that "[t]here are trees that are growing up through the asphalt." He testified that they have "no functional utility." He opined that the cost of removing the obsolete tennis courts should be reflected as a reduction in the value of the parcel.

Martin testified that he had received a bid of $24,875 for removal of the tennis courts, the sidewalk along the tennis courts, and concrete stairs. He testified that the County Assessor had applied a $25,000 deduction for functional obsolescence to the assessed value of the subject parcel from 2004 through 2009. The deduction was not applied starting in 2010. The evidence demonstrated that there had previously been four tennis courts when the deduction had been provided and that as of the effective date of the valuations at issue in this case, only two tennis courts remained.

Martin testified that the subject parcel is located in a neighborhood identified by the County Assessor as "B09." He testified that neighborhood B09 includes approximately 122 parcels, but that only 2 of them comprise 3 or more acres. He specifically identified one other parcel that comprised 8.91 acres and that had an assessed value of $8,910. He also testified that the parcels in neighborhood B09 which had sold between July 1, 2008, and June 30, 2010, all ranged in size from .28 acres to .53 acres and that the sales prices per acre ranged from $38,000 per acre to $79,500 per acre. He opined that none of the sales was a "comparable sale" for the subject parcel.

Martin testified that "an acreage property is much, much different than a parcel in a platted subdivision that has all amenities and a neighborhood surrounding it and covenants, everything else." He opined that "[t]he value of a smaller parcel is much, much higher than the

value of a larger parcel." Martin testified that there are "an abundance of acreages located . . . in other areas that are adjacent to and nearby the [subject parcel and] most of them are in the B02 neighborhood . . . and others are in the B03 neighborhood." He testified that as a certified appraiser, he did not see any reason to distinguish the acreages that are in the B02 neighborhood and the subject parcel in the B09 neighborhood. The B02 neighborhood designation includes properties to the south, the southeast, and the northwest of the subject parcel, and includes properties that are contiguous with other B09 designated properties.

In the B09 neighborhood, the County Assessor values the first acre of property at $80,000, the second acre at $15,000, and all additional acres after the second at $5,000 per acre. In the B02 neighborhood, the County Assessor values the first acre of property at $60,000, the second acre at $6,000, and all additional acres after the second at $3,000 per acre. Martin identified nine properties in the B02 neighborhood that were relatively similar in size to the subject parcel, ranging from 4.94 acres to 11.09 acres, and noted that the assessed valuation of the land for each was less than that applied to the subject parcel.

Martin also testified about parcels in the "Fontanelle area," a group of lots developed around a public golf course. He testified that the area was developed in the early 1970's as "a mixed-use development" that included various residential lots and an 18-hole golf course. The area also included an apartment complex. In addition, there were tennis courts "for the people in the neighborhood to use." He testified that the neighborhood tennis courts "are the obsolete tennis courts" currently found on the subject parcel. The golf course ceased to exist in 2009, and the property has since been separated into ownership parcels that are "all wooded, rolling fairways, grass, . . . very similar to the subject [parcel] and very similar in that it's part of the old recreational facilities for the neighborhood that became obsolete and now are in private ownership."

He testified that the parcels comprised of the former golf course range in size from "five and a half acres up to 15 acres, most of them in the 6 to 9 acre range." He testified that those parcels are all valued at $3,200 per acre. He testified that if the same $3,200 per acre was applied to the subject parcel, the land would be valued at approximately $21,000 rather than the $118,200 valued by the County Assessor. He also testified that one of the parcels had sold in August 2010 at a price of $11,641 per acre.

Martin opined that the subject parcel is not being taxed equally with similar properties within the county. He testified that he did not see any reason to assess the land value of the subject parcel differently than similar properties located in the B02 neighborhood, that there was no comparable sale data to support such a distinction, and that the only comparable sale data was of a parcel in the "Fontanelle area" that sold for $11,600 an acre.

Martin testified that if the subject parcel was valued consistently with lots in the B02 neighborhood, the total valuation of the subject parcel's 6.64 acres of land would be approximately $79,920. He opined that the market value of the subject parcel was consistent with that sale at $11,600 per acre. Applying such a per-acre value would result in a value of the subject parcel's 6.64 acres of land of $77,024. He testified that both alternative valuations for the land should then be reduced to reflect the approximate $25,000 cost of removing the obsolete tennis courts.

## 2. COUNTY BOARD'S EVIDENCE BEFORE TERC

Larry Houlton, a residential real estate assessor for the County Assessor, testified on behalf of the County Board. Houlton was responsible for valuing the subject parcel for tax years 2011 and 2012. Houlton testified that Sarpy County uses a "modified cost approach through the Marshall and Swift Valuation Service" to "get a replacement cost estimate, depreciated replacement cost estimate. It's then adjusted for depreciation factors in the county and then more specifically in the neighborhood."

Houlton testified that "neighborhoods" as used by the County Assessor for valuation purposes, "would be areas that would have similar influences on properties that can be physical or man-made or natural boundaries." He testified that "you want to look for comparable houses that are . . . going to be in competition with each other" and that are "going to be of the same quality, near the same age." With respect to land valuations, he testified that "[i]t'd be great to have just land sales, but you don't always have land sales, so you can also back into" determining land value "by taking a sale of . . . an improvement with a land and improvement, and the replacement cost for the improvement would be deducted from the sales price, which would leave you with a land value."

Houlton testified the County Assessor uses a land table that has been established for the particular neighborhood and that values property differently if it is "a lot, a basic unit," or if it is "under the acreage category." In the B09 neighborhood, a lot is valued at $50,000; an acreage is valued at $80,000 for the first acre, $15,000 for the second acre, and $5,000 per acre for additional acres. He testified that the approach recognizes that with acreages, the first acre is going to be the "buildable area" and is worth more than subsequent acres. He testified that the values per acre are based on gathering sales data and setting up a model.

Houlton testified that the properties classified as being in the B09 neighborhood were so classified because "the properties in the B09 neighborhood [are] higher quality, newer homes, and of larger square foot, and were generally in that [geographic] area . . . most fairly contiguous." He testified that the subject parcel "did fit as far as improvements were concerned, and age, and size."

Houlton testified that the subject parcel and the other B09 neighborhood properties differed from those classified in the B02 neighborhood. He testified that "[t]he B09 characteristics were much newer properties, average age about 1995. The B02 neighborhood average age is about 1945. The quality grades for the [B09] neighborhood is averaged about 4-5 . . . good class, the quality grade for the B02 neighborhoods was right around the average quality, 3-0." He testified that the subject parcel fits within the B09 neighborhood "much closer than it would the B02" neighborhood. He testified that the subject parcel comprises a 1998, very good quality house of 3,883 square feet; the B02 neighborhood averages are homes built around 1945, of lower quality, and with an average size of 1,560 square feet. He also noted that the subject parcel physically "sits connecting with much of the B09 neighborhood."

Houlton testified that the "Fontanelle area" golf course lots were also not comparable to the subject parcel. He testified that the lots identified by Martin were still classified "in the commercial department" and that, at the time, an owner could not "get a building permit" to build a house on them. He also specifically testified about other exhibits offered by Martin as

comparable parcels, indicating that they were not comparable to the subject parcel because of poor access or the presence of sewer lines and ravines running through the properties.

Houlton testified that he had no personal knowledge about the condition of the tennis courts on the subject parcel because he had not inspected them. He acknowledged that if he had inspected the tennis courts and determined them to be "totally worthless," then he could have made an adjustment on the valuation. He testified that he would have used "the Marshall and Swift" valuation service to determine an estimate for removal of the tennis courts. He testified that he had not inspected the tennis courts and that "[e]very time [he] asked to inspect the property, it's been refused." The record indicates that a certified letter requesting inspection was sent, but no response was received from the taxpayer.

On examination from TERC, Houlton testified that he was physically at the subject parcel in January 2010 and that he had knocked and no one answered. He testified that there were dogs in the back yard and he left the property. Martin called Houlton after Houlton returned to the office and "told [Houlton] in no uncertain terms to not visit his property again without permission." Houlton testified, "So I have not been back on this property."

Houlton opined that the appropriate valuations for the subject parcel for 2011 and 2012 were as set by the County Assessor and accepted by the County Board. He testified that the values were set using generally accepted mass appraisal principles.

### 3. TERC FINDINGS

TERC recognized that the topography of the subject parcel resulted in portions of it being unbuildable, but found that those portions still contributed value to the subject parcel "by providing a buffer from neighbors." This finding was consistent with testimony by Martin that Giff had acquired additional adjacent unbuildable land within the past 5 years.

TERC found that Giff had presented clear and convincing evidence that the subject parcel should receive a deduction for functional obsolescence associated with the deteriorating tennis courts. TERC found that the estimate provided by Martin, however, was not clear and convincing evidence of the appropriate amount for the deduction and, instead, relied upon the "Marshall and Swift" valuation service guidelines for removal of the tennis courts. TERC specifically found that Giff had not quantified "the size of the stairs and risers associated with the tennis courts" and refused to allow any deduction associated specifically with them. TERC concluded that Giff was entitled to a deduction of $15,581 for tax year 2011 and $16,180 for tax year 2012.

TERC found that the various properties argued by Giff as comparable to the subject parcel were not comparable. TERC found that "there is no clear and convincing evidence that the County determination regarding the Subject Property was arbitrary or unreasonable."

TERC found that the "modified cost approach" described by Houlton was "defined in mass appraisal literature as the allocation method or allocation by subtraction." TERC found that the method is a commonly accepted mass appraisal technique most suitable for use for residential properties in subdivisions with sufficient sales. TERC found that the determination of the market "neighborhood" areas used by the County Assessor conforms to generally accepted mass appraisal techniques.

- 5 -

In summary, due to the omission of a deduction for the tennis courts, TERC found competent evidence to rebut the presumption that the County Board had faithfully performed its duties and had sufficient competent evidence to make its determination and found there was clear and convincing evidence the County Board's decision was arbitrary or unreasonable. TERC modified the County Assessor's and the County Board's valuation to reflect the above deductions for the obsolete tennis courts, resulting in a total valuation of the subject parcel of $528,557 for tax year 2011 and $494,921 for tax year 2012. This appeal followed.

## III. ASSIGNMENTS OF ERROR

Giff has assigned 13 errors on appeal. Giff's assignments of error, restated and combined, challenge TERC's failure to further modify the valuation of the subject parcel for tax years 2011 and 2012.

## IV. ANALYSIS

Although Giff has presented 13 assigned errors, the arguments presented in her brief on appeal are focused on arguing that the valuation of the subject parcel was improper for tax years 2011 and 2012 because the parcel should not be valued according to land tables in the B09 neighborhood and should, instead, be valued as more consistent with the B02 neighborhood or the "Fontanelle area" golf course lots. Giff also argues that TERC erred in finding that she had refused inspection of the subject parcel and in applying the "Adverse Inference Rule" to conclude that an inspection would have militated against her. Giff asserts that TERC erred in not allowing a larger deduction for the obsolete tennis courts and in not finding that the subject parcel was unequally treated compared to other property in the county. We find no merit to these assertions.

Appellate courts review decisions rendered by TERC for errors appearing on the record. *JQH La Vista Conf. Ctr. v. Sarpy Cty. Bd. of Equal.*, 285 Neb. 120, 825 N.W.2d 447 (2013). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.*

Neb. Rev. Stat. § 77-5016(9) (Cum. Supp. 2012) provides:

> In all appeals, excepting those [involving the taxpayer-initiated appeal of a county tax levy], if the appellant presents no evidence to show that the order, decision, determination, or action appealed from is incorrect, the commission shall deny the appeal. If the appellant presents any evidence to show that the order, decision, determination, or action appealed from is incorrect, such order, decision, determination, or action shall be affirmed unless evidence is adduced establishing that the order, decision, determination, or action was unreasonable or arbitrary.

Accord *JQH La Vista Conf. Ctr. v. Sarpy Cty. Bd. of Equal., supra*.

The language of § 77-5016(9) creates a presumption that the county board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. *JQH La Vista Conf. Ctr. v. Sarpy Cty. Bd. of Equal., supra*. That presumption disappears when there is competent evidence adduced on appeal to demonstrate that the board has not faithfully performed its official duties or has not acted upon

sufficient competent evidence to justify its action. *Id.* From that point forward, the reasonableness of the valuation fixed by the board becomes one of fact based upon all of the evidence presented. *Id.*

The burden of showing that the county board's valuation is unreasonable rests upon the taxpayer on appeal from the action of the board. *Id.* The burden of persuasion imposed on the complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. *Id.*

Giff challenged only the land valuation for the subject parcel for tax years 2011 and 2012. Giff argued to TERC that the subject parcel should not be valued according to the land tables for the B09 neighborhood and should, instead, be valued as being more consistent with properties in the B02 neighborhood or the "Fontanelle area" golf course lots.

Before TERC, Houlton, the real estate assessor for the County Assessor, testified that the properties classified in the B09 neighborhood, including the subject parcel, were so classified because they were all "higher quality, newer homes, and of larger square foot, and were generally in that [geographic] area . . . most fairly contiguous." He specifically testified that the subject parcel "did fit" with the B09 neighborhood classification "as far as improvements were concerned, and age, and size."

He specifically testified that the subject parcel and the other B09 neighborhood properties were not comparable to those classified in the B02 neighborhood and that the subject parcel fits within the B09 neighborhood "much closer than it would the B02" neighborhood. He testified that the subject parcel comprises a 1998, very good quality house of 3,883 square feet, while properties in the B02 neighborhood were, on average, homes that were built around 1945, of lower quality, and with an average size less than half that of the subject property. He also testified that the subject parcel physically is connected with much of the B09 neighborhood.

Houlton similarly testified that the subject parcel and the properties in the "Fontanelle area" golf course lots were not comparable. He noted that the golf course lots were still classified as commercial parcels and that, at the time, an owner could not get a building permit to build a house on them. He specifically testified about particular exhibits offered by Giff as comparable parcels, indicating that they were not comparable to the subject parcel because of poor access or the presence of sewer lines and ravines.

TERC found that the valuation method used by the county is a commonly accepted mass appraisal technique suitable for residential properties in subdivisions and that the determination of the market "neighborhood" areas used by the County Assessor conforms to generally accepted mass appraisal techniques. We find no merit to Giff's challenges to the County Board's acceptance of the valuation of the property as consistent with the B09 neighborhood parcels and TERC's affirmance of that valuation on the basis of her assertions that the subject parcel should have been valued as being more consistent with other classifications. The burden of showing that the valuation was unreasonable rested upon Giff, and we conclude that she has not overcome her burden of showing that the county's valuation was unreasonable or arbitrary. There was clear competent evidence to support the county's valuation.

Giff also argues that TERC erred in not awarding a larger deduction to the valuation for the obsolete tennis courts. The County Board did not allow any deduction, but TERC found that a deduction was warranted, concluding that Giff had presented clear and convincing evidence that a deduction was appropriate. TERC based the amount of the deduction allowed on the "Marshall and Swift" valuation service guidelines for the removal of the tennis courts, rather than on the specific bid that Giff presented as evidence.

Giff also argues that TERC erred in applying the "Adverse Inference Rule" to conclude that she had denied inspection of the property and that an inspection would have militated against her. She argues that the evidence did not support the conclusion that she denied inspection of the property.

As TERC noted, the Nebraska Supreme Court has held that the County Assessor is to act upon his own information and make personal inspection of the property in order to be entitled to the presumption as to the validity of the official assessment. *Grainger Bros. Co. v. Lancaster Cty. Bd. of Equal.*, 180 Neb. 571, 144 N.W.2d 161 (1966). Based on this notion, TERC concluded that it "has previously found that . . . where the taxpayer refuses the County's request to inspect the property, the provisions of the Adverse Inference Rule are triggered." TERC cited to a Nebraska Court of Appeals opinion in a workers' compensation case, wherein this court noted that the workers' compensation court properly considered the claimant's failure to call an available witness who the claimant purported at trial would possess information important to proving the claim. See *Yarpe v. Lawless Distributing Co.*, 7 Neb. App. 957, 587 N.W.2d 417 (1998). We also noted that after evidence has been introduced tending to prove a case, if the opposing party fails to testify to matters peculiarly within his knowledge and necessary to his defense, a presumption exists that his testimony, if produced, would militate against his interest. *Id.*

In the present case, it is not particularly clear how any "Adverse Inference Rule" was actually applied against Giff. Although it is true that TERC referenced the "Rule" in its opinion and indicated that in the context of tax equalization cases, the "Rule" provides that where the taxpayer refuses to allow inspection of the property and challenges the assessed value as determined by the county, there is created a rebuttable presumption that the results of the inspection would militate against the taxpayer's interest. TERC then specifically held that Giff had provided clear and convincing evidence that she was entitled to a deduction for the obsolete tennis courts, despite the county's failure to personally inspect them.

We agree that there is not clear evidence that an inspection was ever requested and refused. Houlton testified that after he had visited the property and knocked on the door without receiving an answer, he was told not to return "without permission." He also testified that "every time he was asked to inspect it's been denied." He did not, however, testify about any instance in which he had requested permission to inspect the tennis courts and permission was actually denied. Giff's husband, Martin, testified that permission would have been granted if requested.

Even assuming, however, that TERC erroneously concluded that permission to inspect was denied, a finding we specifically conclude we need not make, there is no indication that TERC actually applied the "Adverse Inference Rule" to Giff's detriment. As noted, TERC specifically found that Giff had proven that she was entitled to a deduction for the obsolete tennis courts, notwithstanding the lack of any inspection by the county. This is not consistent with a

conclusion that inspection would militate against Giff's interest, as it is a specific recognition that even without inspection, Giff had demonstrated her entitlement to relief.

TERC relied upon the "Marshall and Swift" valuation service to determine the appropriate amount of the deduction for the obsolete tennis courts, rather than agreeing to allow a deduction for the full amount of the bid submitted by Giff. In *JQH La Vista Conf. Ctr. v. Sarpy Cty. Bd. of Equal.*, 285 Neb. 120, 825 N.W.2d 447 (2013), the Nebraska Supreme Court specifically recognized that the "Marshall and Swift" valuation service is a mass appraisal tool approved by Nebraska's Tax Commissioner and the Department of Revenue. Moreover, TERC specifically pointed out that Giff had not quantified the size of the stairs and risers associated with the tennis courts, further explaining its rationale for awarding a deduction that was less than the bid submitted by Giff.

When the taxpayer overcomes the presumption of validity for the county's valuation, the reasonableness of valuation becomes a question of fact based upon all of the evidence presented. See *id.* In this case, TERC made a factual determination about the appropriate amount of the deduction to which Giff was entitled for the obsolete tennis courts. That determination is supported by competent evidence and is neither arbitrary, capricious, nor unreasonable.

Similarly, Giff's remaining arguments that the valuation of the subject parcel was grossly excessive are without merit. As noted, there was abundant evidence and testimony presented concerning the various properties Giff asserted as comparable to the subject parcel and why they were, in fact, not comparable. There was no evidence adduced to demonstrate that the valuation placed upon Giff's property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty. See *id.* As such, we find Giff's appeal to be without merit and we affirm.

AFFIRMED.